## NIPIGON TRANSIT CO. *v.* SMYTHE.

CONTRACTS—AGENT'S AUTHORITY.

The seller of wood wrote the buyer to find out what he could get a boat to deliver it for. The buyer replied that the boat Westford would carry it for a certain price, which was satisfactory to the seller, and the arrangement was made that the boat should go when the wood was ready. The agent of the boat, thinking it could not go at the time agreed upon, notified the buyer's bookkeeper that he could send another vessel, the Hayward. The seller was informed by wire that the latter boat could be sent, and not noticing the name of the boat, answered by wire to send the boat. The Hayward for some reason did not go, and the agent arranged with the buyer's bookkeeper that the steamer Ford should carry the wood. *Held*, (1) that the minds of the parties did not meet on any contract regarding the Ford, (2) that the buyer's bookkeeper was not authorized by the seller to engage the boat unconditionally.

Error to Wayne; Donovan, J. Submitted April 6, 1904. (Docket No. 17.) Decided July 7, 1904.

Assumpsit by the Nipigon Transit Company against W. R. Smythe for an alleged breach of contract to transport certain wood. There was judgment for plaintiff on a verdict directed by the court, and defendant brings error. Reversed.

*Howard B. Bloomer*, for appellant.

*Wilkinson, Post & Oxtoby*, for appellee.

HOOKER, J. The Nipigon Transit Company, plaintiff, owner of a steamer named " J. C. Ford," recovered a verdict and judgment for damages growing out of an alleged breach of contract, under which the Ford was sent to Thessalon, Ontario, for a cargo, which defendant failed to furnish. The defendant brings error, claiming that the

testimony in the case did not establish a contract relation, and that the court should have directed a verdict for the defendant. Other points are also involved.

The plaintiff states that the facts were undisputed, and therefore it was the court's duty to direct a verdict, in which the defendant concurs, but claims that it was directed for the wrong party. The defendant, Smythe, contracted to furnish and deliver at Detroit, to the Detroit Sulphite Fiber Company, several hundred cords of pulp wood. This had to be transported by boat from Thessalon. On July 12, 1902, defendant wrote the sulphite company to ascertain what it could get the wood taken down for, not, as counsel for plaintiff state in their brief, "to secure a vessel for him." Lindsay, the treasurer of the sulphite company, saw Parker, of the Parker Chartering Company, brokers, who offered the steamers Westford and Monitor to carry the wood at $2.25 per cord. On July 15th Lindsay wrote Smythe, saying:

"According to your request, I saw this a. m. the Parker Chartering Co. in relation to boats to bring your wood down. They proposed to let us have the propeller Westford and its consort, he said they would carry between them 400 cds. In two trips this would probably bring all the wood you have up there including what we have left over. The frt. they name is $2.25 per cd. They claim the expense of loading is much greater than it was formerly, I tried to induce them to make the frt. $2.00 but did not succeed. Capt. Humphrey runs the above named boats and would be a good man to work with you."

This was acceptable to Mr. Smythe, and it was arranged that the boats should go to Thessalon when the wood should be ready. Humphrey, the captain, wrote Smythe that he would be ready to load about August 11th, and Smythe wired in reply that he feared it would be impossible to load then, and confirmed telegram by letter to Humphrey, then at Algoma Mills, saying that he had some time before written the sulphite company that he could not load before August 15th. On August 14th Humphrey wired again, inquiring when he would load, and Smythe replied,

"Aug. 24, sure." This reply was sent August 16th. Meantime Humphrey had telegraphed Parker that the wood would not be ready for three weeks, and asked what else he had for him. This was about August 9th, and Humphrey stated that he expected to fill in the time until the wood should be ready, but, receiving no orders, he proceeded to Thessalon, arriving there on August 16th or 17th. Parker, taking it for granted that Humphrey would not be able to take the wood at the time mentioned, informed Harris, the bookkeeper of the suphite fiber company (Lindsay being absent) that he could send the Hayward, and Harris telegraphed on the 19th to Smythe, who lived at a distance of several miles from Thessalon (his business of loading there being in charge of one Barrett), and was ignorant of Humphrey's movements, that:

"Hayward can be up on 23d. Where will she load? Answer immediately."

Smythe, not noting the name to be different from Westford, replied on the 20th:

"Telegram rec'd. Send vessel to Thessalon."

About the time that Smythe's last telegram reached Detroit, plaintiff's representative telephoned Parker from Port Huron, asking if he had anything to load the Ford with, and Parker gave him the charter for this wood, and notified Mr. Harris, who said he "would take the Ford, and would notify Smythe that she was coming." Parker replied that, "if he heard nothing to the contrary, the Ford would leave Port Huron at 6 p. m. that night." Harris wired Smythe, in the name of the fiber company, that the Ford, capacity 400 cords, would be at Thessalon on Friday night. Smythe was absent, and did not receive the telegram until late in the evening of August 21st, before which time the Ford had left Port Huron, and she arrived at Thessalon about the same time that he received the message. August 22d Capt. Morrison, of the Ford, wired Smythe:

"Steamer Ford arrived here last night.   Wire orders at once."

Smythe at once wired back:

"I never chartered your boat.   Who sent you?   And what are you after?   Mistake somewhere, am writing."

He wrote confirming telegram, and that he had some wood, but that Westford and consort were to carry it, and that he could not let him load it unless under the distinct understanding that he was chartered by the Detroit Sulphite Fiber Company to carry the wood, as he thought there must be a blunder somewhere, for he had only the day before received a message that Westford would be there "tonight," and told him to "see Barrett." Morrison replied, "Barrett not home," etc.   Considerable correspondence followed, and Morrison remained there some days, trying to get some of the wood that he might hold for demurrage, under the instruction of his superior.

At the time of the Ford's arrival the Westford had been loading for two days, though Smythe did not know it. The Ford finally left on August 30th with a two-thirds load secured from other parties.

The court closed his charge as follows:

"Gentlemen, it is not necessary to use a great many words in this case.   Find out, when you go to your jury-room, in the language as stated to you, which one of these innocent parties—for they were both candid about it— which one of the innocent persons enabled the loss to happen, and charge him with it."

He afterward directed a verdict for the plaintiff.   The jury returned a verdict for $700 in favor of the plaintiff.

We see no reason for doubting that all of these parties acted in the best of faith.   The sulphite fiber company made arrangement for the Westford and consort on behalf of defendant, which he ratified.   The confusion that resulted was due, first, to a misunderstanding between Humphrey (captain of the Westford) and Parker, his broker, who then proposed sending the Hayward, and

Harris wired defendant that the "Hayward could be up on 23d. Where will she load?" It is quite evident that the defendant did not note the fact that this was another boat than the one contracted for, but, be that as it may, the Hayward was not sent. On the contrary, Parker found another boat that he could send, and Harris agreed with him that he would wire Smythe that she was coming, and Parker then stated that, unless he heard to the contrary, the Ford would leave Port Huron at 6 o'clock. The main question in the case is whether the court should have instructed the jury that this action of Harris in chartering the Ford was within his authority, or whether it was a question for the jury. The request made of Lindsay in the first instance was to "find out what he could get wood taken down for." Harris subsequently wrote a letter, which indicates that, in pursuance of an understanding had between Lindsay and Smythe, it was acceptable to the latter to have the Westford and consort engaged, and that Harris, acting under Lindsay's instruction, had engaged them. No other authority was ever given by defendant to either Lindsay or Harris to engage any other boat, unless it is to be inferred from his answer to the telegram about the Hayward. Had the Hayward gone, the case would have presented a different question. As it is, it may be said that Harris might naturally infer that Smythe's answer justified the sending of some other vessel if the Hayward could not be had. It is clear that none of the parties could have understood that Smythe intended to have another vessel sent, unless those agreed upon—i. e., the Westford and consort—should fail him. He was not in a position to know about that, while Parker should have been, and doubtless supposed that he did know. If it be conceded that Smythe understood from the telegram (which is improbable) that another vessel than the two contracted for was to be sent, he had a right to suppose that it was because Parker had found it inconvenient or impossible to send the Westford and consort. The testimony shows that the Ford was sent under a mis-

understanding, and that the minds of the parties did not meet upon any contract regarding her, nor is there any substance to the claim that Harris was authorized to engage her unconditionally under the circumstances.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.